1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE HERNANDEZ,<br><br>    Petitioner,<br><br>  v.<br><br>M. STAINER,<br><br>    Respondent. | Case No.: 1:11-cv-00489-AWI-JLT<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS CORPUS (Doc. 1)<br><br>ORDER DIRECTING THAT OBJECTIONS BE FILED WITHIN TWENTY-ONE DAYS |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner is in custody of the California Department of Corrections and Rehabilitation ("CDCR") serving an indeterminate sentence of thirty-seven years-to-life, pursuant to a judgment of the Superior Court of California, County of Kern (the "Superior Court"). (Doc. 12, Lodged Document ("LD") 1, pp. 541; 546; 551; 556; 631. The sentence resulted from Petitioner's convictions by jury for attempted murder (Cal. Pen. Code §§ 664/187); robbery (Cal. Pen. Code § 211); attempted robbery (Cal. Pen. Code §§ 664/211); and street terrorism (Cal. Pen. Code § 186.22(a)). (Id.). A special gang enhancement and an enhancement for discharge of a firearm were also found to be true. (Cal. Pen. Code §§ 186.22(b); 12022.53(d) & (e)). (Id.).

1

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA").  On September 24, 2009, the 5th DCA, in an unpublished decision, affirmed Petitioner's conviction and sentence.  (Doc. 11, Ex. A).   Petitioner filed a petition for review in the California Supreme Court that was denied on December 12, 2009.  (LD 6).  Also, on September 10, 2010, Petitioner filed a state habeas petition in the Superior Court for the County of Kern, which was denied on November 10, 2010.  (LD 7).

On March 23, 2011, Petitioner filed the instant petition.  (Doc. 1). Respondent's answer was filed on May 17, 2011.   (Doc. 11).  Respondent concedes that all grounds for relief in the petition have been fully exhausted.  (Doc. 11, p. 6).  On August 1, 2011, Petitioner filed his Traverse.  (Doc. 17).

## FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

Appellant's convictions and the enhancements were based upon offenses he committed with Ramirez on May 21, 2007, at Belle Terrace Park, but they were not apprehended that day. Appellant and Ramirez were arrested a few weeks later, when they were involved in a shooting and led the police on a high-speed chase, but the instant case does not involve any charges filed against them for that incident. We will address both situations since the latter incident led to the victims' identifications of appellant and Ramirez as their assailants at Belle Terrace Park.

**The Belle Terrace Park offenses (counts 1 through 4)**

Around 7:00 p.m. on May 21, 2007, Carmen Soto-Chavez and his girlfriend, Ana Diaz, were driving in the Belle Terrace Park area in Bakersfield to look for an apartment to rent. They had never been in the area. Belle Terrace Park is almost in the center of the area claimed by the Okie Bakers gang, and law enforcement officers are often called to the park and surrounding streets on reports of gang violence, burglaries, assaults, and narcotics activities.

Soto-Chavez stopped his car next to the park so Diaz could make a cell phone call. Soto-Chavez leaned back in the driver's seat while Diaz placed the call. Diaz was sitting in the front passenger seat, and she was holding a cell phone, a newspaper, and $100 for the rent. Both front windows were open.

Diaz was about to call someone about an apartment when two men walked from the park to their car. The men went to the driver's side window and asked Soto-Chavez for money. Soto-

---

[1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the 5th DCA.

Chavez and Diaz subsequently identified the two men as appellant and Ramirez.

Diaz testified both men were at the driver's side door and talking to Soto-Chavez. She could not hear what they were saying, but she knew something was wrong and started to dial 911 on her cell phone. Appellant saw the cell phone in Diaz's hands. Ramirez stayed at Soto-Chavez's driver's side window, and appellant walked around to the passenger window. Appellant told Diaz to throw down the cell phone because it made him nervous. Diaz complied and dropped the cell phone on the floorboard. Appellant saw the cash in Diaz's hands, told her to give him the money, and Diaz handed over the money to appellant.

Soto-Chavez testified the other man stayed at his window and demanded more money. Soto-Chavez tried to open his door and the suspect backed up. Soto-Chavez stepped out of the car but the suspect called out for help from some other people in the park, and Soto-Chavez saw about five people heading for his car. Soto-Chavez got back into the car and started the engine. One of the two original assailants then produced a revolver and shot Soto-Chavez twice.

Diaz testified that, just before she heard the gunshots, appellant was still on the passenger side of the car and suddenly "sucker-punched" Diaz in the face. It happened so fast that she did not see his fist coming through the open passenger window. Diaz testified that Ramirez was still on other side of the car with Soto-Chavez when appellant punched her. After the punch, Diaz saw Ramirez lift up his shirt to show that he had a gun. Diaz was sure that Ramirez and not appellant showed the gun and that Ramirez was still on the driver's side.

Diaz testified that, as Ramirez showed the gun, appellant said to give him anything of value in the car. Diaz said they did not have anything else. Appellant said, "we could shoot you." Diaz testified appellant was still standing at the passenger window when Diaz heard gunshots from the driver's side of the car, and Soto-Chavez was shot in the chest and arm.  Diaz testified appellant tried to open the passenger door, but Soto-Chavez started the car and put it in reverse, and the two suspects ran away.

Kern County Sheriff's Deputy Joel Swanson responded to the scene and found Soto-Chavez and Diaz still in their car, in another section of the park. There were two bullet holes in the front driver's side door and two bullet holes in the rear driver's side door. Soto-Chavez's car was searched and there were no drugs or weapons in the vehicle. A witness at the scene reported that a man ran from the victims' car and concealed an unknown object in his waistband as he ran.

Soto-Chavez suffered nonfatal wounds in the left chest and left arm. Kern County Sheriff's Deputy David Castillo interviewed him at the hospital. Soto-Chavez did not appear to be under the influence of drugs or alcohol, he answered all of Castillo's questions, and he was very afraid about being shot. Soto-Chavez said one of the suspects was 24 years old and had a large tattoo on the right side of his neck. The tattoo was possibly some type of writing, but Soto-Chavez could not read the tattoo because it was partially covered by the assailant's crew-neck T-shirt. Soto-Chavez said the gunman shot him with a medium-sized revolver.

Diaz testified the assailant on the passenger side of the car, whom she identified as appellant,

3

was wearing a black T-shirt. Diaz did not recall seeing any tattoos on appellant's neck or face, but explained that she tried not to look directly at him because she was afraid she was going to be shot. Diaz testified, however, that she clearly remembered his face.

Deputy Cesar Ollague conducted the investigation and showed the victims numerous photographs of possible suspects, but they did not identify or recognize anyone. There were no leads in the case, but Soto-Chavez and Diaz were "adamant" that they would be able to identify the suspects if they saw them again.

On June 2, 2007, Ollague contacted both Soto-Chavez and Diaz and showed them several group photographs of the Okie Bakers gang from the social networking Web site, MySpace.com. The victims did not recognize or identify anyone from these photographs. Appellant was not depicted in them.

**The apprehension of appellant and Ramirez**

Later on the evening of June 2, 2007, several hours after Soto-Chavez and Diaz looked at the MySpace photographs, officers from the Bakersfield Police Department's gang and narcotics units were on patrol in the Belle Terrace Park area as part of a "saturation" patrol to deter crime around the park because of problems caused by members of the Okie Bakers gang. Around 8:00 p.m., Officer Shane Shaff heard several gunshots and responded. Several witnesses said shots had been fired from a large black SUV with two Hispanic males, the vehicle had just left the area, and a red SUV had also been involved. Shaff found several shell casings on the street and immediately notified the other units about the situation.

Officers Richard Dossey and Kyle Ursery were part of the saturation team and heard the shooting dispatch and description of the suspects. They observed a black SUV traveling at a slow rate of speed, about six to eight blocks from the shooting scene. Dossey drove next to the SUV and observed two Hispanic males in the vehicle, with numerous tattoos on their heads. The officers attempted to conduct a traffic stop but the SUV accelerated and led the officers on a lengthy chase, during which Dossey observed bullet holes on the driver's side of the vehicle.

The officers followed the SUV as it turned into a dead-end street and came to an abrupt stop. The driver got out of the SUV and ran through an opening in a fence, which led to the train tracks. Officer Dossey followed the driver through the fence, repeatedly identified himself, and ordered the suspect to stop. The driver, later identified as Ramirez, ignored Dossey and ran along the railroad tracks. Dossey testified that Ramirez had grabbed the waistband of his baggy clothes when he jumped out of the SUV. As a result of his furtive actions, Dossey drew his service weapon as he chased Ramirez along the railroad tracks.

Officer Dossey testified that he was about 30 to 40 feet behind Ramirez when he saw Ramirez pull something from his right side and "begin to make a twisting motion in my direction." As soon as Ramirez twisted, Dossey "observed what would be a firearm in his hand." Dossey fired two shots, but Ramirez held onto his weapon as he continued to turn toward Dossey. Dossey fired a third shot and Ramirez fell down. Ramirez had been shot once in the back and survived the wound.

4

Dossey testified that something flew out of Ramirez's hand as he fell down. The officers found a revolver along the railroad tracks, several feet from where Ramirez fell. The revolver's cylinder was missing.

As Dossey chased Ramirez, Officer Ursery stayed with the black SUV, drew his weapon, and ran to the passenger side. Appellant was sitting in the passenger seat and had suffered a gunshot wound to his leg. Appellant was not armed, and he was taken into custody without incident.

The black SUV had been stolen. There were multiple bullet strikes and perforations on the front and rear driver's side panels of the SUV, and one bullet projectile was found on the windshield.

Both appellant and Ramirez were taken to the hospital for treatment of their gunshot wounds. Detective Freddie Calvillo later interviewed appellant at the hospital, advised him of the warnings pursuant to <u>Miranda v. Arizona</u> (1966) 384 U.S. 436, and asked how he had been shot. Appellant said his cousin, Ramirez, had dropped him off in the area of Belle Terrace Park so appellant could walk to his grandmother's house. As appellant left the SUV, he heard gunshots and he was hit in the upper left leg. The gunshots also hit the SUV. Appellant got back into the vehicle, and Ramirez drove away. Calvillo asked appellant why Ramirez did not stop for the police. Appellant thought Ramirez was trying to get him to the hospital.

**The photographic lineups**

Sergeant Craig Rennie was involved in the investigation into the pursuit of the black SUV and shooting of Ramirez. Rennie learned the suspect apprehended inside the stolen SUV, appellant, was a Hispanic male with a tattoo on the side of his neck, and a revolver had been recovered. Rennie was also aware of Ollague's investigation into the Belle Terrace Park incident, that one of the suspects was described as a Hispanic male with a tattoo on his neck, and that a revolver was involved in the robbery and shooting. Rennie thought the situations were similar enough to warrant further investigation and informed Deputy Ollague about the suspects who had just been apprehended.

Around 9:00 p.m. on June 2, 2007, Deputy Ollague received Sergeant Rennie's information and the names and descriptions of appellant and Ramirez. Ollague prepared separate photographic lineups which included recent photographs of appellant and Ramirez, since they were both on parole. Appellant had a large tattoo on the right side of his neck, so the photographic array for appellant included pictures of individuals with large tattoos on their necks. Ollague contacted Soto-Chavez and Diaz, asked them to meet him at the sheriff's office that night, and they agreed.

At approximately 10:30 p.m. on June 2, 2007, Deputy Ollague separately showed the photographic lineups to Soto-Chavez and Diaz to determine if appellant and Ramirez were involved in the May 21, 2007, incident. He tape-recorded each interview. Both Soto-Chavez

5

and Diaz identified Ramirez and appellant as the men who accosted them at Belle Terrace Park.

When Ollague showed Soto-Chavez the photographic lineup which contained appellant's picture, Soto-Chavez identified appellant as one of the two suspects and said he was 80 percent sure of his identification. Ollague showed Soto-Chavez additional photographs of the tattoo on the right side of appellant's neck. Soto Chavez then said he was "more sure" of his identification of appellant, and he was 99 percent sure that appellant was one of the robbers.

Soto-Chavez identified Ramirez as the second suspect and said he was 60 percent sure. Soto-Chavez thought appellant was the person who shot him, but he thought Diaz would be more certain about which suspect was on her side of the car.

Ollague testified that Diaz immediately identified appellant from the photographic array and said she was 100 percent positive about her selection. Diaz identified appellant as the man who was on her side of the car, took her money, and punched her in the face. Diaz said appellant was not the person who showed them the weapon or shot Soto-Chavez, and she never saw appellant with a weapon. Ollague did not show Diaz the separate photographs of appellant's neck tattoos since she immediately identified appellant.

Diaz identified Ramirez as the other suspect who stayed on the driver's side of the car with Soto-Chavez. Diaz said she was only 50 percent sure of her selection because she did not look at the other suspect as much.

**Further investigation**

On June 4, 2007, Deputy Ollague and other officers went to the residence of Jeannette Vasquez, who is Ramirez's mother and appellant's aunt, based on information from the suspects' grandparents that both men lived with Vasquez and that appellant had left a bag with his belongings there. Ollague testified that he asked Vasquez if appellant and Ramirez were staying at her house, and Vasquez said yes. Ollague asked about appellant's bag, and Vasquez said the bag was in her grandson's bedroom, where appellant had been sleeping.

Vasquez told Ollague that appellant was also known as "Smiley" and Ramirez was known as "Lonely." Vasquez said Ramirez was associated with the Okie Bakers and she was trying to prevent him from being involved with the gang.

Ollague and the officers went into the bedroom, and Vasquez handed them the bag from the top of the bed. The officers conducted a parole search of the bag and the bedroom. The bag contained a document from the California Department of Corrections in appellant's name, which showed an "aka of Smiley." The bag also contained a birthday card with notes written to "Smiley" and a letter written to "Chango" and signed by "Smiles" of the "Lil' Okie" and "Loz Cyclonez," with a return address in appellant's full name at his grandmother's house.

Ollague also found a CD case, a letter written by Ramirez, and a white binder in the bedroom, all of which were next to the bag. The CD case had graffiti about the Okie Bakers and the

words "Smiley" and "Lil' Lonely." The binder contained a poem about the writer's loyalty to the gang lifestyle. Written on the furniture and walls of that bedroom were numerous words commonly used as graffiti for the Okie Bakers, including "Okies," "Bakers," "Cyclonez 13," "Lil' Lonely," and "Smiley."

At trial, Vasquez claimed the items seized by the officers belonged to her young grandson who slept in that bedroom, her grandson and his friends wrote the words on the bedroom furniture and walls, and she did not know what they meant. Vasquez claimed appellant lived with his grandmother in the "Okie" neighborhood, he often visited that part of town, and his tattoos referred to that geographic area of Bakersfield.

**The Okie Bakers Gang**

Deputy Ollague, the prosecution's gang expert, testified he had been a law enforcement officer for over 11 years and had served in the gang unit since 2007. He had received formal training on gangs and gang lifestyle, he had had numerous personal experiences with members of both Norteno and Sureno gangs in Kern County, and he had daily contact with gang members in the course of his work. He had testified as a gang expert in Kern County on five prior occasions.

Ollague testified the Okie Bakers was a criminal street gang that claimed the color blue and the number 13, and it was a Sureno Hispanic gang that claimed allegiance to the Mexican Mafia. The members use hand signs designating "O" and "B." The Okie Bakers Cyclonez and Okie Bakers Malditos are subsets of the gang and get along with each other.

Ollague testified Belle Terrace Park was almost at the center of the territory claimed by the Okie Bakers, gang members regularly frequent the area, and there were numerous examples of graffiti in and around the park to show the area was within the turf of the Okie Bakers, including the terms "OBC" for Okie Bakers Cyclonez, "OBM" for Okie Bakers Malditos, and "13" for the letter "M."

There were over 100 members of the Okie Bakers in Bakersfield. The gang did not have any formal leadership and was fairly unorganized, but members and associates gained power and prestige within the gang by committing violent crimes, and they received more prestige if the crimes were more violent. The principal rivals of the Okie Bakers were the Varrio Bakers, Loma Bakers, and Rexland Bakers.

Ollague was familiar with the activities of the Okie Bakers based on his investigation of criminal offenses committed by gang members and interviews with them. He testified the gang's primary activities were criminal offenses, including homicides, auto thefts, violent assaults, and narcotics activities. Ollague testified about the specific details of three prior offenses committed by members of the Okie Bakers, including possession of a firearm by an ex-felon, vehicle theft, and a drive-by shooting. Appellant and Ramirez had not been involved in these incidents.

**Gang Evidence about Appellant and Ramirez**

Deputy Ollague testified that appellant was a member of the Okie Bakers based on several factors. Appellant claimed "South," "South Okie," or "South Bakers" when he was booked into custody on eight occasions from 2001 to 2007. Appellant's gang moniker was "Smiley" and he had a tattoo that said "Smiley" on his right shoulder. Photographs of appellant taken from 2002 to 2007 showed the following tattoos: "Okie" on the right side of his neck; "OBKS" across his chest; "X3" on his chest, denoting the number 13; "Okie" on his right wrist; "Okie" on his left arm, from his elbow to his wrist; "Cyclonez" in large print on the back side of his head; "Sur" on the left side of his neck, just below his ear; and three dots under his right eye. Appellant had obtained a new tattoo since his arrest in this case, "a demonic face of some sort with two hands forming the letter O on the top of his head," and it said "Smiling Faces" just above his forehead.

Ollague testified about appellant's prior contacts with law enforcement officers. In 1992, appellant asked a subject to join a gang, the subject refused, and appellant threatened to hit him with a bat. In 2001, appellant reportedly shot at people who were in Okie Bakers' territory because they showed disrespect. In 2002, appellant contacted someone whose car had recently been stolen and attempted to extort $200 from her for return of the car. The victim knew appellant and that he was a member of the Okie Bakers. In 2004, appellant and another member of the Okie Bakers conducted a carjacking and robbery; appellant pointed a shotgun at the victim and took his wallet and cell phone.

Ollague testified that Ramirez was also a member of the Okie Bakers. Ramirez's tattoos included "Okie," "13," and "property of MOB," referring to the gang's subset, on his left arm, and "Okie" on his left hand. Ramirez claimed "South Okie" when he was booked from 2005 to 2007. During the search at Vasquez's house, Ollague found paperwork referring to Ramirez as "Lil' Lonely," and a letter sent from a Wasco inmate to Ramirez referred to a fight and encouraged Ramirez to "keep that Okie pride alive inside."

Ollague testified Ramirez's prior encounters with the police included an incident in 2004, when a member of the rival Varrio Bakers shot Ramirez and Jose "Bugsy" Flores, who was a respected member of the Okie Bakers. Flores was killed and Ramirez was wounded. Ramirez told the police that he was a member of the Okie Bakers. Ramirez later added a tattoo on the left side of his neck which said, "thug gangster memory Bugsy," referring to Flores, and there were numerous gang members in the territory claimed by the Okie Bakers with tattoos to memorialize "Bugsy." Ramirez told the officers that he was "jumped" into the Okie Bakers when he fought four other gang members. In 2006, Ramirez was found in possession of a loaded handgun and drugs, and he told the officers that he was a member of the Okie Bakers and he carried a gun because "the streets are crazy."

Deputy Ollague testified that based on the prior criminal conduct of appellant and Ramirez, their gang monikers and tattoos, their possession of gang paraphernalia, the gang graffiti in the bedroom where they were staying, and their association with other gang members, appellant and Ramirez were active members of the Okie Bakers. Ollague explained their large tattoos were significant because it classified them as "a walking billboard of the gang. When they're walking down the street and you have Okie or their moniker or their clique name on their head, it's just advertising the gang, ... instilling fear within the members of that community."

Based upon a hypothetical question, Ollague opined that two members of that gang would have committed the robbery and shooting of Diaz and Soto-Chavez for the benefit of the gang. Ollague explained the offenses were committed by two members of the Okie Bakers in association with each other, for the monetary benefit of using the stolen cash to buy drugs or weapons, and to show members of the "non-gang" public who frequent that park that the gang controls that area.

> "[T]he word spreads around that these gang members conduct this activity, and, therefore, instill fear and intimidation into ... the community as a whole, and that's one of the biggest benefits they get from it. They run that park. They commit crimes of opportunity there at that park. Members of the public fear to even step, you know, with their kids into that park. But they're out there and they see this type of activity. That's the ... biggest benefit."

The offenses were committed by two gang members during the day, and "that's just the type of activity that they commit in there. They're pretty brazen about it."

Ollague conceded that neither Soto-Chavez nor Diaz reported hearing the suspects shout any gang-related slogans or refer to their gang during the robbery and shooting, that Soto-Chavez saw part of appellant's tattoo but could not read what it said, and Diaz did not notice any tattoos. However, Ollague explained that the more violent, serious, and brazen the crime, the more status the members gain within the gang, so that the offenses were also committed to promote themselves within the gang by spreading fear and intimidation through the community.

**Defense evidence**

Dr. Robert Shomer, an expert on the factors involved in perception, memory, and eyewitness identification, testified that accuracy rates are low and further reduced when the witnesses are involved in life-threatening situations.

The defense presented evidence that on May 24, 2007, Deputy Roger Clark assisted in the preparation of 11 photographic lineups that were shown to Soto-Chavez and Diaz. There were a total of 66 photographs in the arrays, and four of the lineups depicted adults and seven depicted juveniles. The victims could not identify anyone from these lineups. Clark booked these lineups into evidence, but he subsequently learned the booking area had no record of the photographs. Clark testified that photographs of appellant and Ramirez were not in the adult lineups.

The defense also called two people who were witnesses to the conclusion of the pursuit of the black SUV on June 2, 2007, both of whom insisted that an officer ran up to the SUV and fired his weapon into the passenger side of the vehicle, where appellant was sitting.

(Doc. 12, Ex. A, pp. 2-14).

9

# **DISCUSSION**

## I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

## II.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000).  A state court decision involves an "unreasonable application" of clearly established federal law "if the

state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(*per curiam*).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788. Put another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the state court's decision. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that

the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

1   "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."

2   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's

3   claims on procedural grounds or did not decide such claims on the merits, the deferential standard of

4   the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v.

5   Morgan, 313 F.3d at 1167.

6       The prejudicial impact of any constitutional error is assessed by asking whether the error had

7   "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v.

8   Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding

9   that the Brecht standard applies whether or not the state court recognized the error and reviewed it for

10  harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate

11  prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S.

12  648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective

13  assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice

14  standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila

15  v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir.

16  2009).

17  **III.  Review of Petitioner's Claims.**

18      The instant petition itself alleges the following as grounds for relief: (1) insufficient evidence

19  to support Petitioner's conviction for aiding and abetting an attempted murder; (2) insufficient

20  evidence to support the gang enhancement.

21      I.  Sufficiency Of The Evidence To Support Aiding And Abetting An Attempted Murder.

22      Petitioner first contends that insufficient evidence was presented to support Petitioner's

23  conviction as having aided and abetted Ramirez's attempted murder of the victim Soto-Chavez.  This

24  contention is without merit.

25          A.  The 5th DCA's Decision.

26  The 5th DCA rejected Petitioner contentions as follows:

27

28

13

Appellant contends there is insufficient evidence to support his conviction as an aider and abettor for count 1, the attempted murder of Soto-Chavez, because there is no evidence he intended to aid or facilitate the actual gunman, Ramirez.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (People v. Bolin (1998) 18 Cal.4th 297, 331.)

We do not reweigh evidence or redetermine issues of credibility. (People v. Ferraez (2003) 112 Cal.App. 4th 925, 931.) We apply the same standard to convictions based largely on circumstantial evidence, which may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt. (People v. Meza (1995) 38 Cal.App. 4th 1741, 1745; People v. Bradford (1997) 15 Cal.4th 1229, 1329.)

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (People v. Lee (2003) 31 Cal.4th 613, 623.) "[I]mplied malice is an insufficient basis upon which to sustain a charge of attempted murder because specific intent is a requisite element of such a charge." (People v. Chinchilla (1997) 52 Cal.App. 4th 683, 690.) It is well-settled that the express malice or intent to kill element required for attempted murder may be inferred from the defendant's acts and the circumstances of the crime. (People v. Smith (2005) 37 Cal.4th 733, 741.)

Appellant was convicted of the attempted murder of Soto-Chavez as an aider and abettor. A person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts. (People v. McCoy (2001) 25 Cal.4th 1111, 1117.)

> "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault. [Citation.]" (People v. McCoy, supra, 25 Cal.4th at p. 1117.)

Whether the defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment. (People v. Campbell (1994) 25 Cal.App.4th 402, 409.)

Appellant's contention that there is insufficient evidence to support his conviction as an aider and abettor of the attempted murder of Soto-Chavez is based on the following premise. Appellant acknowledges that Soto-Chavez thought appellant was the person who shot him. Appellant notes that as to the firearm enhancements, however, the jury herein found it was not true that appellant personally and intentionally discharged a firearm and caused great bodily injury, i.e., the nonfatal gunshot wounds suffered by Soto-Chavez. Instead, the jury found true the special allegation that appellant was a principal in the offenses and that a principal discharged a firearm and proximately caused great bodily injury. Appellant logically argues the jury's findings on the special allegations were based upon Diaz's testimony-Ramirez was on the driver's side of the car, showed the gun, and shot Soto-Chavez; appellant was on the passenger

14

side of the car, took the cash, punched Diaz, and did not shoot anyone. Appellant thus asserts that his conviction for attempted murder must be based upon Soto-Chavez's testimony that he thought appellant was the suspect who shot him.

Appellant further argues that, because the jury was not instructed on the natural and probable consequences doctrine of aiding and abetting, his culpability as an aider and abettor could only be based upon sharing the same mental state as Ramirez-to wit, the specific intent to kill Soto-Chavez. Appellant thus concludes that his conviction as an aider and abettor to attempted murder must be reversed because there is no evidence that he shared Ramirez's specific intent when Ramirez shot Soto-Chavez.

Respondent does not argue against appellant's premise. We thus examine the first manner in which a defendant may be convicted as an aider and abettor. " 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citations.]" (People v. Campbell, supra, 25 Cal.App. 4th at p. 409.)

> "When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing-which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (People v. Lee, supra, 31 Cal.4th at p. 624.)

The evidence supporting appellant's conviction as an aider and abettor to the attempted murder of Soto-Chavez is substantial. As appellant acknowledges, the jury's findings as to the firearm enhancements were clearly based upon Diaz's testimony: that appellant stood next to her passenger side window while Ramirez shot Soto-Chavez through the driver's window. Those same aspects of Diaz's testimony also support appellant's conviction for attempted murder.

Taken together, the victims' testimony as to the actions and conduct of appellant and Ramirez establishes that both men were working together and clearly shared the same intent. As noted by respondent, "[a]mong the factors which may be considered in determining aiding and abetting are: presence at the crime scene, companionship, and conduct before and after the offense." (In re Juan G. (2003) 112 Cal.App. 4th 1, 5.) Appellant and Ramirez arrived at the car together and demanded money from Soto-Chavez. Appellant's direct and unequivocal threat to shoot the victims, delivered as Ramirez displayed the gun, was indicative of their shared intent and demonstrated appellant's encouragement for Ramirez to shoot the victims as he demanded more things of value from them. While Ramirez shot Soto-Chavez, the evidence strongly suggests that appellant was the leader since he took the money from Diaz, punched her in the face and threatened to shoot the victims, and demanded more from them. Appellant clearly was not surprised when Ramirez shot Soto-Chavez because, instead of running away, appellant tried to open Diaz's door and get into the car. He only failed because Soto-Chavez started the car and threw it into reverse. It was only then that appellant and Ramirez fled together.

Based upon this evidence, the jury reasonably could have inferred that appellant shared Ramirez's intent to kill. We thus conclude appellant's conviction as an aider and abettor of the attempted murder of Soto-Chavez is supported by substantial evidence, that he knew of and

15

shared the same specific intent as Ramirez.

(Doc. 11, Ex. A, pp. 15-19).

### B.   Federal Law On Sufficiency Of The Evidence.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" See id., quoting Jackson, 443 U.S. at 319.  Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  A jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations.  See id. at 957-958.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of aiding and abetting).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275.[1]

Moreover, in applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

Recently, in Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson,

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that

---

[1]Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

they must nonetheless uphold.

Cavazos, 132 S.Ct. at 3.

> "Jackson says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id., at 326, 99 S.Ct. 2781.

Cavazos, 132 S.Ct. at 6. [2]

Finally, a fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam); see West v. AT & T, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law...."). It is through this lens that this Court must view any insufficiency of the evidence claim.

C.  Analysis.

The 5th DCA's opinion carefully negotiated the rather serpentine analysis required under California law to determine the culpability of an aider and abettor.  First, the Court noted that both the defense and prosecution agreed on appeal that the issue squarely presented was whether, as an aider and abettor, Petitioner had the same requisite mental state, i.e., the intent to kill, as Ramirez, the actual shooter.  After framing the issue, the state court looked to Diaz's testimony and found it established substantial evidence of Petitioner's guilt as an aider and abettor: Petitioner stood on the passenger side of the car, supported Ramirez in his demands for money, hit Diaz in the face during the robbery, and was present when Ramirez shot Soto-Chavez.

Having determined that substantial evidence supported Petitioner's conviction as an aider and

---

[2] To the extent that the 5th DCA's opinion does not expressly cite the Jackson v. Virginia standard in analyzing the sufficiency claims herein, it must be noted that, long ago, the California Supreme Court expressly adopted the federal Jackson standard for sufficiency claims in state criminal proceedings.  People v. Johnson, 26 Cal.3d 557, 576 (1980). Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard.

abettor, the only remaining question is whether Petitioner shared Ramirez's mental state, i.e., intent to kill, thus elevating Petitioner's culpability to attempted murder, the same as that of the principal, Ramirez.  The Court concluded that substantial evidence existed that Petitioner had the same mental state as Ramirez: Petitioner and Ramirez arrived together at the victims' car, demanded money from Soto-Chavez, Ramirez displayed his weapon while Petitioner threatened to kill the victims, and then, when Ramirez shot Soto-Chavez, Petitioner acted with the authority of the "leader" by continuing to make threats and demanding more money from the victims.  The Court also noted that Petitioner "clearly was not surprised when Ramirez shot Soto-Chavez because, instead of running away, [Petitioner] tried to open Diaz's door and get into the car.  He only failed because Soto-Chavez started the car and threw it into reverse."  (Doc. 11, Ex. A, pp. 18-19).

Here, where both perpetrators made death threats against the victims, each assisting the other in what appears to be a highly coordinated assault, and where the shooting does not appear to have been either an accident or impulse by Ramirez, but rather part of a jointly understood and planned strategy of attack, the evidence is certainly sufficient to support a finding by reasonable jurors that Petitioner shared the same homicidal mind state as Ramirez.  Accordingly, the state court's adjudication was neither contrary to nor an unreasonable application of clearly established federal law.[3]

II.  Sufficiency Of The Evidence Regarding The Gang Enhancement.

A.  The 5th DCA's Decision.

The 5th DCA also rejected Petitioner's second claim as follows:

Appellant contends the jury's true findings on the gang enhancements (§ 186.22, subd. (b)(1)(C)) are not supported by substantial evidence because there is insufficient evidence of the "specific intent to promote, further, or assist in any criminal conduct by gang members ...." (§ 186.22 subd. (b).)

---

[3] In his Traverse, Petitioner argues that he cannot be held culpable as an aider and abettor if the evidence shows merely that he was at the scene of the crime and had a relationship with Ramirez, or that he took no steps to prevent the crimes from occurring.  (Doc. 17, p. 11).  As discussed above, much more evidence was presented of the coordinated attack by Petitioner and Ramirez than just these circumstances.  Additionally, Petitioner dismisses testimony that he said, "We can shoot you," when Ramirez brandished the gun.  (Id. at p. 16).  Petitioner argues that this statement is "ambiguous" and merely demonstrates a "present capability to kill." (Id. at 16-17).  In the Court's view, the state court's inference that this was not a mere statement of fact, but instead a bona fide threat to kill someone, is a reasonable inference that is amply supported by the record.

As with substantive offenses, the substantial evidence rule applies when determining whether the evidence is sufficient to sustain a jury's finding on a gang enhancement:

> "The record must disclose substantial evidence to support the verdict-i.e., evidence that is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (People v. Ramon (2009) 175 Cal.App. 4th 843, 850, citing People v. Boyer (2006) 38 Cal.4th 412, 480.)

The trier of fact may rely upon expert testimony about gang culture and habits to reach a finding on the gang enhancement. (In re Frank S. (2006) 141 Cal.App.4th 1192, 1196.)

The evidence supporting the gang enhancements here is substantial. Deputy Ollague's expert testimony was properly admitted to establish that the Okie Bakers was a criminal street gang, the gang claimed Belle Terrace Park and the surrounding neighborhood as its territory, and its members committed violent crimes in the park to demonstrate their control over their territory. Gang members were "brazen" in their open commission of violent offenses within the park. The park was full of gang graffiti. The purpose was to intimidate members of the public and thus gain further criminal control.

The particular circumstances of this case certainly fit the picture painted by Ollague's testimony. This was a brazen robbery committed in view of anyone present in the area of a public park. No apparent effort was made by the assailants to hide their attack or to otherwise keep a low profile. The victims appear to have been selected at random, though Diaz apparently had money in her hands, for there is no evidence to indicate she had displayed that money to anyone outside the car in which she sat. Perhaps most tellingly, when Soto-Chavez attempted to exit the car, Ramirez called out to other persons nearby for help, and about five men began to approach. In the circumstances, it is reasonable to infer that those to whom Ramirez called were other members of his gang.

In Deputy Ollague's opinion, the instant offenses would have been committed not only for the monetary benefit reaped from the actual robbery but also with the specific intent to promote the Okie Bakers' criminal activities by demonstrating the gang's control of the area and thus intimidating members of the public. Given the circumstances, we find this opinion well supported by the evidence.

This is not a case in which, as in Ramon, the expert merely "informed the jury of how he felt the case should be resolved" rather than explaining the facts upon which the expert's opinion was based. (People v. Ramon, supra, 175 Cal.App. 4th at p. 851.) It is not a case like Ramon, in which the conclusion that the defendant had the requisite specific intent depended upon only the facts that the crime was committed in the company of another gang member and was committed within gang territory. (Id. at pp. 851, 853.)

Appellant would have us find that the evidence here is insufficient because it does not show a specific intent to "facilitate other criminal conduct" by the Okie Bakers. (Garcia v. Carey (9th Cir.2005) 395 F.3d 1099, 1103, italics added; see Briceno v. Scribner (9th Cir.2009) 555 F.3d 1069, 1079-1080.)

Respondent, on the other hand, would have us declare that the requisite specific intent is shown where the evidence demonstrates that the "'defendant intended to commit [the crimes], that he intended to commit them in association with [his accomplices], and that he knew that [his

accomplices] were members of his gang.'" (Briceno v. Scribner, supra, 555 F.3d at 1084 (dis. opn. of Wardlaw, J.), citing People v. Villalobos (2007) 145 Cal.App. 4th 310; People v. Romero (2006) 140 Cal.App.4th 15; People v. Morales (2003) 112 Cal.App. 4th 1176, 1198.)

In the circumstances presented, however, we need not be drawn into this debate. Substantial evidence supports the conclusion that the present crimes were committed with the specific intent to promote the Okie Bakers gang through intimidation of the public in a place occupied and controlled by the gang. Given that the gang's primary activities include the commission of various criminal offenses, promoting the gang results in promoting, furthering, or assisting in "any criminal conduct by gang members." (§ 186.22, subd. (b).) Substantial evidence supports the enhancements.

(Doc. 11, Ex. A, pp. 22-24).

B. Analysis.

The gang enhancement contained in Cal. Pen. Code § 186.22(b)(1) contains two elements: (1) the felony must be committed for the benefit of, at the direction of, or in association with any criminal street gang; and (2) the felony must be committed with the specific intent to promote, further, or assist in any criminal conduct by gang members.  Cal. Pen. Code § 186.22(b)(1); see Briceno v. Scribner, 555 F.3d 1069, 1078 (9th Cir. 2009).

The state court's analysis is based on two separate lines of evidence, i.e., the testimony of the gang expert setting forth his views regarding the operation of the Okie Bakers in the area where the crimes occurred, and the actual evidence of the crime, which, as the state court noted, "fit the picture" painted by the gang expert's testimony.  Specifically, the evidence at trial showed that the crimes of robbery and attempted murder were "brazenly" committed in broad daylight by two unmasked suspects in Belle Terrace Park, the victims were randomly chosen, and when one victim attempted to leave her car, Ramirez called for help and five individuals approached him.  Such circumstances, in which the perpetrators assert complete physical control over the park and make no effort to hide their identities, matched precisely the gang expert's testimony that the Okie Bakers was a criminal street gang and that Belle Terrace Park was at the center of the gang's territory.  Moreover, the evidence was overwhelming that both Petitioner and Ramirez were members of the Okie Baker gang, a finding supported by the gang tattoos, gang monikers, the statement of Ramirez's mother, and the evidence of gang membership obtained from Petitioner's residence.

From this substantial evidence, the Court has little trouble concluding that reasonable jurors

could have found that the crimes were committed for the benefit of, at the direction of, or in association with the Okie Bakers, which was a criminal street gang, and, furthermore, that the crimes were committed with the specific *i*ntent to promote, further, or assist in any criminal conduct by members of the Okie Bakers.  Cal. Pen. Code § 186.22(b)(1).

In his Traverse, Petitioner relies on the fact that neither of the victims knew about gangs, whether Petitioner and Ramirez were in a gang, or what gang members might look like.  (Doc. 17, p. 23).  Petitioner also notes that, under Ninth Circuit case law, gang membership alone is insufficient to trigger the gang enhancement.  (Id.).  This is true.  However, on the other hand, the Ninth Circuit does not require express evidence of gang motivation and membership, e.g., through use of gang tattoos or clothing or statements to the victims about gang membership.  Rather, applying Jackson, this Court is only required to consider whether, construing all of the evidence, *including reasonable inferences*, in the light most favorable to the prosecution, reasonable jurors could have found the enhancement true beyond a reasonable doubt.  As discussed above, Respondent has met this minimal standard.  Hence, the state court adjudication was not contrary to or an unreasonable application of clearly established federal law.

## **RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one (21) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time

1   may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th

2   Cir. 1991).

3

4   IT IS SO ORDERED.

5       Dated:   **October 24, 2013**                    **/s/ Jennifer L. Thurston**

6                                                        UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28